# In the United States Court of Federal Claims

No. 09-111C
(Filed: May 25, 2010)

```
* * * * * * * * * * * * * * * * * *   *
                                      *
BRC LEASE COMPANY,                    *   RCFC 12(b)(1) Motion to Dismiss;
                                      *   Contract Disputes Act, 41 U.S.C. §§
              Plaintiff,              *   601-613; Election Doctrine; Same
                                      *   Claim Pending Before Civilian Board
       v.                             *   of Contract Appeals
                                      *
THE UNITED STATES,                    *
                                      *
              Defendant.              *
                                      *
* * * * * * * * * * * * * * * * *     *
```

*Timothy F. Brown,* Washington, DC, for plaintiff.

*Cameron Cohick,* U.S. Department of Justice, Washington, DC, with whom were *Tony West,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant.

### ORDER GRANTING DISMISSAL

**FIRESTONE**, *Judge*.

Pending before the court in this contract dispute action brought pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613 (2006), is the defendant's ("government's") motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the

1

Rules of the Court of Federal Claims ("RCFC").[1]  For the reasons set forth below, the government's motion to dismiss is **GRANTED**.

## BACKGROUND FACTS

**A.     The Contract Dispute**

The relevant facts are taken from the complaint and may be summarized as follows: This case arises from a dispute between the National Institutes of Health ("NIH") and BRC Lease Company, LLC ("plaintiff" or "BRC") concerning the construction and leasing of the NIH Biomedical Research Center ("project") at the Johns Hopkins Bayview Medical Campus in Baltimore.  The project is designed under a "build-to-lease" arrangement, whereby BRC has secured the funding for the project and is paid through NIH's monthly rental payments.[2]  BRC is the successor in interest to FSK Land

---

[1] The government argues, in the alternative, that should the court find that dismissal is not appropriate, transfer to the Civilian Board of Contract Appeals ("CBCA") pursuant to Section 10(d) of the CDA, 41 U.S.C. § 609(d), would be proper.  That section provides:

> If two or more suits arising from one contract are filed in the United States Court of Federal Claims and one or more agency boards, for the convenience of parties or witnesses or in the interest of justice, the United States Court of Federal Claims may order the consolidation of such suits in that court or transfer any suits to or among the agency boards involved.

41 U.S.C. § 609(d).

[2] The project employed a complex funding arrangement in which BRC obtained the funding through bonds.  Ambac Assurance Corp., a bond insurance firm, guaranteed the $200 million loan from Bayview Research Center Lease Finance Trust, a trust established between the Bank of New York and the Federal Funding Group, LLC, to Bayview Finance, LLC, of which BRC is the sole member.  The Bank of New York acts as the escrow agent and trustee. (CBCA 1236 Compl. ¶ 16.)  The bulk of NIH's monthly lease payments are debt service rent to allow BRC to pay the bondholders.

Corporation ("FSK"), the original party to a June 15, 2001 lease with NIH.[3] Pursuant to that lease, FSK entered into a Development Management Services Agreement with Smith Management and Construction, Inc. ("Smith") for the design and construction of the project that is at issue in this case.[4] The project involved the design and construction of new laboratory and clinical space for NIH. As Development Manager, Smith entered into an Agreement for Construction Services ("Construction Agreement") with contractor Skanska USA Buildings, Inc. ("Skanska").

The Construction Agreement required Skanska, the contractor, to substantially complete the project on or before January 18, 2007. Skanska did not achieve substantial completion until October 27, 2007, whereupon NIH took possession and was to begin payment. The lease included a Lease Rider:

> <u>The Government and Lessor [(BRC)] agree as follows with regard to the Government's remedies against the Lessor for the acts and omissions of the Lessor that arise from acts or omissions of the Development Manager [(Smith)] or other subcontractors [(Skanska)] of Lessor</u> . . . . In the event the Government is damaged as a result of the breach of contract by the Development Manager or any of its subcontractors, or any other subcontractor of the Lessor, or as a result of the negligence or intentional misconduct of the Development Manager, its subcontractors, or any other subcontractor of Lessor, <u>the Government will pursue its claim either directly, or through the Lessor, against the Development Manager, its subcontractors, or other subcontractor of Lessor, as the case may be, and the Government will be limited in its recovery to the amount the Government recovers from the Development Manager, its subcontractors, or other subcontractors of Lessor, as the case may be</u>.

---

[3] Both BRC and FSK are corporate creations of Johns Hopkins University and the Johns Hopkins Health System.

[4] BRC, as FSK's successor in interest, is now a party to this agreement.

(Compl. ¶ 16 (emphasis added).)  The NIH Contracting Officer ("CO") stated in a December 18, 2007 letter to BRC that because Skanska did not achieve substantial performance of the project until October 27, 2007, BRC was to instruct Skanska to pay liquidated damages of $50,000 per day for the period of January 18 through October 27, 2007.

Thereafter, Skanska failed to achieve final completion of the project and by letter dated March 24, 2008, NIH advised BRC that Skanska had "not demonstrated diligence or promptness to correct the failure, default[,] nor neglect in accordance with the contract documents." (Pl.'s Opp. to Def.'s Mot. to Dismiss Ex. 1.)  The letter further advised BRC that the government would proceed to complete Skanska's work at a then-estimated cost of $1,789,204.  In the March 24, 2008, letter the CO further stated:

> [T]he Government effective immediately elects to contract or otherwise perform the requirements and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs.  [Smith] provided a reasonable detailed list of incomplete contract requirements with an estimated value of $1,789,204.00.  <u>The Government reserves the right to correct the deficiencies and seek additional damages as required under the lease or allowed by law.  The Government will provide actual contract proposals along with invoices to BRC for your records and deduct cost to correct deficiencies through the lease payments beginning with March rents</u>.
> . . . .
> <u>This is the final decision of the Contracting Officer</u>.  You may appeal this decision to the [CBCA]. . . . Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims . . . .

(Id. (emphasis added).)

NIH did not withhold any rent payments in March or April of 2008. However, on May 2, 2008, NIH notified BRC that NIH intended to withhold May 2008 rent and future rent equal to the amount of the cost of cure. (Id. Ex. 6.) NIH followed up this email with a letter to BRC dated May 15, 2008 which enclosed a copy of Cure Proposals "pursuant to the Default Letter dated March 24, 2008." (Id. Ex. 7.) This letter stated:

> [NIH] has contracted directly with [Smith] to cure the deficiencies as stated in the Cure Notice dated February 22, 2007 [sic]. These cure proposals do not represent the total cure and the NIH reserves the right to continue to contract directly and seek damages as warranted. The total amount of these cure proposal[s] is $232,290.00[,] which will be offset by May rents.

(Id.) The Cure Proposals documented the amount NIH was to spend to cure various aspects of the project that were incomplete or defective. Thereafter, NIH began withholding additional portions of rent due to BRC as an offset to the cost of curing Skanska's defaults, sending Cure Proposals to BRC each month showing the amount to be withheld.[5] (See id. Ex. 10.)

On June 19, 2008, the surety and escrow agency, Bank of New York ("BONY"), at the direction of Ambac Assurance Corp., the bond insurer, wrote to NIH stating that NIH was in default of its obligations under the lease because of NIH's failure to pay rent in the full amount due. (Id. Ex. 8.) BONY stated that withholding rent was prohibited by the Lease Rider. In response, NIH wrote to BONY on July 15, 2008, stating:

> The NIH has the authority to withhold rent payments and disagrees with the

---

[5]Total rent due to BRC was $13,013,000.00 annually, payable in monthly installments of $1,084,416.66.

> position that a withholding of rent constitutes a default under the Lease. The Federal Acquisition Regulation General Clauses are included in the lease. These clauses include the Mutuality of Obligation clause, which states in relevant part, "The obligations and covenants of the Lessor, and the Government's obligation to pay rent under this Lease, are interdependent. . . . No setoff pursuant to this clause shall constitute a breach by the Government of this lease." Moreover, as set forth in the Failure in Performance Clause, 48 C.F.R.[ §] 552.270-10, "The covenant to pay rent and the covenant to provide any service, utility, maintenance, or repair required under this lease are interdependent." This clause authorizes the Government to perform a requirement of a lease that has not been satisfied and to deduct the cost of performing the requirement from the rent.

(Id. Ex. 9.)

In accordance with its expressed position, the government continued sending monthly invoices reflecting the cost of completing and correcting work on the project and withholding the amount of these costs from BRC's rent. By December 31, 2008, NIH had withheld $3,659,235.06 from rent otherwise due to BRC.

**B.     CBCA Complaint**

On June 20, 2008, BRC filed a notice of appeal of the CO's March 24, 2008 decision with the CBCA ("CBCA 1236"). The CBCA 1236 complaint, filed September 26, 2008, which is primarily a "pass-through" claim filed on behalf of Skanska by BRC, claims that NIH's final decision in March 24, 2008 was erroneous in that BRC was not in default of its obligations under the lease because Skanska fully completed the project. (CBCA 1236 Compl. ¶¶ 39-52.) The complaint claimed that to the extent any work remained incomplete, NIH had overstated the cost required to complete it, had continued to add tasks to be completed or corrected, and had delayed final completion by failing to

conduct inspections to certify completion of particular items. (Id. 53-56.) In its prayer for relief, BRC requested, on behalf of Skanska, findings that (1) the CO's decision is erroneous; (2) Skanska fully completed work on the project; and (3) "NIH's failure to issue a certificate of final completion is unjustified and contrary to the Government Lease and applicable law." (Id.) The CBCA 1236 complaint also states, with regard to BRC, that (1) "NIH's withholding of lease payments is unjustified and contrary to the Government Lease and applicable law"; and (2) NIH should not have withheld $1,789,204.00 in lease payments. (Id.)

The case before the CBCA has been placed in mediation. The mediation is focused upon disputes between Skanska and NIH.

C.   **Court of Federal Claims Complaint**

BRC filed the present complaint on February 20, 2009. In it, the plaintiff claims that the language in the Lease Rider expressly precludes NIH from withholding rent owed to BRC on account of acts or omissions of Smith or Skanska. (Compl. ¶¶ 16, 17.) Accordingly, BRC claims that NIH's withholding of $1,870,031.06 (i.e. the amounts withheld after December 31, 2008) constitutes a breach of NIH's lease. As relief, the plaintiff requests a finding that the government's failure to pay the full amount of rent due is a breach of its lease and an award of damages to be proved at trial, but exceeding $1,870,031.06, plus interest.

D.   **Present Motion**

Following filing of the plaintiff's complaint in this court, the government moved to dismiss the plaintiff's complaint under RCFC 12(b)(1) on the theory that the plaintiff had the same claim pending before the CBCA and that under the "Election Doctrine," the plaintiff could not maintain the same claim before the Court of Federal Claims.  In response, the plaintiff argues that the claims before the CBCA and this court are not the same on the grounds that the CBCA case challenges the March 24, 2008 decision regarding Skanska's default, whereas this case challenges later decisions regarding the specific amounts of rent to be withheld.  BRC contends that these amount to separate final decisions by NIH that can be challenged in separate actions in separate forums.

On April 15, 2010 the court asked the parties to address whether transfer or consolidation of the cases would be proper under Section 10(d) of the CDA, 41 U.S.C. § 609(d).  In its supplemental briefing on the applicability of Section 10(d) of the CDA, the government advised the court that transferring the case to the CBCA would be appropriate if the court determines it had jurisdiction.  In its supplemental brief, the plaintiff argued that the case should not be transferred.  Rather, the plaintiff suggested that consolidation of the pending CBCA case with the present case in this court would be appropriate.

**STANDARD OF REVIEW**

The standard for ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is well-settled.  The plaintiff bears the burden of

establishing subject matter jurisdiction, Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  Because jurisdiction is a threshold matter, a case can proceed no further if a court lacks jurisdiction to hear it.  See Arbaugh v. Y & H Corp., 546 U.S. 500, 502 (2006) ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the complaint must be dismissed in its entirety." (citation omitted)); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998).  See generally John R. Sand & Gravel v. United States, 552 U.S. 130 (2008).  It is well-settled that when the court considers a motion to dismiss for lack of subject matter jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

## DISCUSSION

Under the CDA, a contractor wishing to contest a contracting officer's final decision may appeal to the appropriate board of contract appeals or bring a direct action in this court.  41 U.S.C. § 609(a) ("in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims.").  The contractor's right to elect the forum of its choice has given rise to the Election Doctrine, which states that once the contractor makes a binding forum election, the decision must stand and the

contractor may not appeal the contracting officer's decision in the non-selected forum. Nat'l Neighbors, Inc. v. United States, 839 F.2d 1539, 1541-42 (Fed. Cir. 1988).

The CDA further provides, however, that there may be instances when separate claims arising under the same contract are properly brought before both the Court of Federal Claims and an agency board. Placeway Const. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir. 1990) ("[T]he CDA recognizes that a single government contract may give rise to more than one claim, and that a contractor may pursue his rights by filing 'two or more suits' in either one or more fora."). These cases typically involve separate and distinct disputes over separate and distinct CO decisions under a single contract where findings made by the court or the agency board would not affect the claims pending in the other. See, e.g., Rockwell Automation, Inc. v. United States, 70 Fed. Cl. 114 (2006) (finding jurisdiction and declining to transfer where the claims in the two forums "arise from the same contract but are otherwise unrelated to one another" and involved different decisions by the CO). In those cases, Section 10(d) of the CDA provides:

> If two or more suits arising from one contract are filed in the United States Court of Federal Claims and one or more agency boards, for the convenience of parties or witnesses or in the interest of justice, the United States Court of Federal Claims may order the consolidation of such suits in that court or transfer any suits to or among the agency boards involved.

41 U.S.C. § 609(d).

In this case, the government contends that the Election Doctrine bars the plaintiff's case on the grounds that the plaintiff's claim before this court involves a challenge to the

same CO decision that is at issue in its complaint before the CBCA, and therefore the present action is barred. The government contends that in both cases BRC seeks a determination that the CO misapplied the BRC lease and impermissibly withheld rents in violation of the Lease Rider. The government argues that the present case involves simply the "implementation" of the CO's March 24, 2008 decision to withhold rent. The pending case does not include any claim separate from that decision. Rather, the government contends, the March 24, 2008 decision to withhold rent due under the lease is central to the subsequent rent withholding.

In response, the plaintiff argues that the claims are not the same, and therefore the present case is properly before this court. At the heart of BRC's argument is its contention that it is entitled to bring separate claims in separate forums because the claim before this court is challenging a series of CO decisions in the form of the cure proposal notices mailed each month regarding the withholding of rent and breach of contract. More specifically, the plaintiff argues that the claim before the CBCA explicitly challenges the CO's March 24, 2008 decision regarding Skanska's compliance with the terms of the contract and thus the CBCA case is more properly characterized as a "pass through" claim. The issue of withholding rent arises only in the context of whether Skanska failed to comply with its contract, and the amount of damages associated with that claim is the estimated cost of repairs in the March 24, 2008 letter. In contrast, BRC argues, the present action is focused only on the lease agreement between BRC and NIH

11

and whether the lease agreement allows for withholding rent, regardless of whether Skanska complied with its contract.  Moreover, BRC argues, even if the CBCA case involves a claim for rent by BRC, the present case involves claims for rent actually withheld and seeks additional damages for breach of contract.

The question controlling the court's jurisdiction is whether the Cure Proposals sent monthly to BRC documenting the government's withholding of rent constitute decisions that are distinct from the March 24, 2008 letter that set forth NIH's determination that withholding rent was proper under the lease and its intent to begin doing so.  In this regard, the facts of this case are similar to the facts in the Federal Circuit's decision in Glenn v. United States, 858 F.2d 1577 (Fed. Cir. 1988).  In Glenn, the Federal Circuit considered the appropriate action to take where a contractor appealed a CO's liability decision to the Armed Services Board of Contract Appeals and the CO's quantum decision in the Claims Court.  In Glenn, the CO issued an initial decision stating that the government had determined that the contractor would be liable for the cost of completing the contract (the "liability decision").  In the liability decision, the CO indicated that the government would determine the extent of that liability in a subsequent decision.  The contractor filed an appeal of the liability decision to the Board.  Thereafter, when the CO issued the second, "quantum," decision, the plaintiff filed an action in the Claims Court.  In determining whether the Election Doctrine barred the Claims Court case, the Circuit explained that the "question controlling" was "whether the quantum decision

supplemented in whole or in part the CO's liability decision . . . ." Id. at 1580 (emphasis added). The Circuit explained that if the quantum decision merely "supplemented" the liability decision and did not raise any distinct and separate claims, "there is but one claim and one decision." Id. As the Circuit stated:

> If the quantum decision did not raise any new claims distinguishable from the claim decided by the liability decision and therefore did not raise any separately appealable claims (i.e., if the quantum decision merely supplemented the liability decision), then there is but one claim and one decision. That claim and the decision being before the board, the Election Doctrine would require that the Claims Court dismiss Glenn's present appeal. . . . Glenn's entire claim would be heard in the pending appeal before the board, Glenn having timely appealed, in effect, his entire claim to that tribunal as his elected forum.
>
> If the quantum decision was entirely distinct, or raised some independently appealable claims, those claims would normally be heard by the Claims Court, or be transferred to the board, at the Claims Court's election, pursuant to [41 U.S.C. §] 609(d), Glenn having elected the Claims Court as the appellate forum for such claims.

Id. (citing Nat'l Neighbors, 839 F.2d at 1541, 1542; Tuttle/White Constructors, Inc. v. United States, 656 F.2d 644, 649 (Ct. Cl. 1981)).[6]

Here, as in Glenn, the controlling question is whether, given BRC's pending claim before the CBCA objecting to the government's withholding of rent for curing Skanska's deficiencies, the monthly letters from NIH to BRC documenting the Cure Proposals are

---

[6]In Glenn, the Federal Circuit ultimately ordered, without resolving the question of whether the quantum decision was supplemental to or distinct from the liability decision, that the case be remanded to the Claims Court and transferred to the agency board based on the interrelatedness of the issues and agreement of the parties.

13

decisions that are separate from the March 24, 2008 decision or simply "supplemental" to the March 24, 2008 liability decision. The court finds, as the Circuit discussed in Glenn, that the monthly letters in this case are "supplemental" to the original March 24, 2008 liability decision. See id. The decision to withhold rent was made by the CO in March 2008 and BRC appealed that decision to the CBCA. The Cure Proposal letters BRC relies upon simply implemented that March 24, 2008 decision. These letters do not raise a different or distinct claim. As such, the rent withholding claims from the March 24, 2008 decision are already before the CBCA. In other words, the CBCA complaint was an appeal of the entire claim stemming from the March 24, 2008 final decision, and that entire claim remains before the Board. Having made its binding forum election by appealing the CO's decision to withhold rent to the CBCA, BRC may not appeal that same decision in the non-selected forum. Nat'l Neighbors, 839 F.2d at 1541-42. Thus, the Election Doctrine requires that this court dismiss the present appeal for lack of jurisdiction. Id. at 1542.[7]

---

[7] Even if the court agreed with the plaintiff that its complaint in this court constituted an appeal of decisions distinct from the March 24, 2008 liability decision, transfer to the CBCA, the initially elected forum, would have been appropriate pursuant to 41 U.S.C. § 609(d). The factors to be weighed in deciding whether to transfer are:

(1)  Whether the disputes before the board and the court concern the same contract;
(2)  Whether the claims before the court and the board duplicate claims or involve overlapping or related issues;
(3)  Whether Plaintiff initially chose to file its claims before the court or a board;
(4)  Whether one forum or the other has made significant progress on the claim;
(5)  Whether concurrent resolution would result in an inefficient allocation of

**CONCLUSION**

The court has carefully weighed the positions of the parties in deciding whether the Election Doctrine requires dismissal of this case under RCFC 12(b)(1). For the reasons set forth above, the plaintiff's complaint is dismissed without prejudice. The clerk is directed to order judgment accordingly. Each party is to bear its own costs.

**IT IS SO ORDERED.**

                                          s/Nancy B. Firestone
                                          NANCY B. FIRESTONE
                                          Judge

---

       court, board, and party resources; and
(6)    Whether separate forums could reach inconsistent results when interpreting the same contract.

CH2M Hill Hanford Group, Inc. v. United States, 82 Fed. Cl. 139, 145 (2008) (citing Giuliani Contracting Co. v. United States, 21 Cl. Ct. 81, 83 (1990); Am. Renovation & Const. Co. v. United States, 77 Fed. Cl. 97, 102-05 (2007); Rockwell Automation, 70 Fed. Cl. at 126-28; Northrop Grumman Corp. v. United States, 70 Fed. Cl. 230, 231-35 (2006)). Each of these factors would have supported transfer to the CBCA in the event that this court determined that it had jurisdiction over the claim before it. The claims are duplicative, could result in inconsistent results, were first filed before the CBCA, and the CBCA has been actively engaged in resolving the dispute by assigning a mediator.
     While the dispute before the CBCA has been and will likely remain in settlement discussions between the government and Skanska for some time, the court sees no reason why the CBCA should not consider giving expedited consideration to BRC's claim that the withholding of rent is prohibited by its lease with NIH. If BRC requests expedited consideration of this claim (which it apparently has not to date), the court would expect the CBCA to give that request careful consideration.